We'll hear the next case, Caravalho v. City of New York. May it please the Court. Your Honor, Skiddy and Orion Oliver, attorney for the plaintiff's appellants in this case. On March 17, 2012, appellants and other Occupy Wall Street protesters gathered in Zuccotti Park. Zuccotti Park occupies around a one block rectangle, square block rectangle in Lower Manhattan. It's a privately owned public space, or POPs, that is owned... A small block as city blocks go? Relatively, but fairly large as far as parks go. And there's a map that's also included in the record that shows more about the dimensions. I'm not sure it's really a park, but we'll treat it as a park. It's even fairly large as far as public plazas go, I would say, Your Honor. I walk by it almost every day. Understood, Your Honor. As a POPs, it's not a purely private place. It's subject, for example, to regulations that require that it stay open and be maintained for public use 24 hours a day, seven days a week, unless there is an exception that's granted by the city after a process. And the regulations that apply do allow private owners to establish and post certain reasonable rules of conduct. Zuccotti Park had been a site that had been traditionally used for group congregation and free speech activities, and certainly had been used frequently by Occupy Wall Street protesters in the preceding six months for those purposes. In the late evening of March 17th, 2012, the police department unilaterally decided to close the park. There is conflicting testimony as to who decided to do that and why and exactly how that came about. There's one version of events that comes from Chief Esposito. There's another version of events that doesn't gel, that comes from Inspector Winsky. Does that matter? I mean, there's no dispute that they gave an order to clear the park in order to clean it. And I assume you would concede that certainly dispersing people to ensure that they can clean it and for the police to do, does it matter what their intentions are or whether they made the decision unilaterally? Doesn't it just matter that the appellants didn't heed that order? I think it does matter, Your Honor, because I think it goes to whether or not that order was lawful. And I think if the police department unilaterally decided to close the park without a request from the private property owner for purported violations of the park's rules, then that's very different than an owner coming in and giving the police department permission to, or asking for their help in clearing the park. I'm sorry, Your Honor. Doesn't the record contain evidence that a Brookfield representative decided to close the park for cleaning? No, it doesn't, Your Honor. The only representative from Brookfield whose testimony is in the record is Mike Larkin. He was with MSA, the security guards who were there, and he does not so testify. And- So it's a public park for purposes of speech, but a private park for the purpose of public order? Well, I'm not sure it's a- It could be both, can it? Well, I think it could, Your Honor, but I'm not sure it's- If a police officer sees someone there in the park who he sees him urinating in the park, can he arrest him? Sure, because public urination in New York City- Public urination. It's a public place for that purpose, certainly. Public place, okay. Yes, Your Honor. So now the police are concerned that there's a crowd there, and they have some concerns about the crowd, and they decide that they want to close the park for purposes of the fact that the crowd might be getting unruly. Could they close the park then? I think that's too vague, Your Honor. Their mere concern about possible disorder, I think that's, under the facts that the court just presented, that's too vague. It's all people putting up tents and other things like that, and they knew that the park had specific rules against it. And they were concerned about what might grow out of that. Could they do that? I don't think so, Your Honor. I think that's too attenuated. If somebody- Now it's private property. Well, I mean- Only the private individuals can enforce the rules. Certainly those are private rules, and it's not the police department's job to enforce my private rules in my apartment, for example. Yeah, but the First Amendment doesn't always creep into your apartment. The First Amendment's there in the park. Yes, Your Honor. I think that's true. That's right. Because the first thing you told us, you talked about a public park. That's right, Your Honor. They're not public. Well, I mean, I think it's public for some purposes. Your claims, but not for the purposes of any defenses. Well, not for the purposes of any defenses. But I don't think the mere fact that it is a public place authorized the police to give dispersal orders unilaterally. Why was the order unlawful in your mind? I think the order was unlawful because it did not come as a result of, or at least a jury could find, that it did not come as a result of a complaint from the property owner, which is the procedure that everybody testified that was followed with respect to the enforcement of the private rules. This is a block that is, in the morning, there are hundreds of people who cross it to get from the transportation hub to Broadway, etc. And you're saying that the police could not intercede to try and keep that area clear without an order from, or a request from Brookfield? I think they might be able to intercede. There would be questions- If they saw hundreds of people setting up tents on that block, that would surely block the access, they could not on their own go in and try to do something about it? Under that circumstance, I think they could, and that would also- How was this order unlawful then? Well, there weren't hundreds of people who were setting up tents, Your Honor. The testimony was that there were perhaps a few people who had done that at some earlier points in the day. Doesn't the record indicate there were hundreds of people there? In present in the park, yes. Almost all day long, there were hundreds of people in the park. It's certainly large enough to accommodate those numbers of people, and there- I'm not sure you could fit, well, whatever. It's a small block, that's the point. So if we disagree with you as to whether the order is lawful, then what? Let's say we conclude the order was lawful, then what? Thank you, Your Honor. Even if the order was lawful, and it was lawful for the police to arrest the plaintiffs, shortly after they were arrested, they were loaded onto an MTA bus. And by that point, for transportation to a police precinct and for arrest processing. And at that point, they had been hopelessly separated from any officer who had observed them do anything prior to their arrest. There was no way for police to match them up with any officer who could swear in an accusatory instrument. They had observed them engage in any unlawful conduct. The cases, so there could not have been prosecutions without any such officers. They knew that. The police department's procedures and practices required that under such circumstances, the police should have cut them loose at that point. And they didn't. And instead of cutting them loose, they brought them to the precinct. There were about 50 arrests that night. Around 11 officers processed those arrests, including a number of the defendant officers. As part of that arrest processing, they filled out, it took them about between 12 and 14 hours at the precinct to fill out arrest processing paperwork that contained false information. How many people were being processed there? Around 50, Your Honor, who had been assigned to around 11 officers, about five each. So they created arrest processing paperwork over the course of around 12 to 14 hours that contained false information about what the officers who were filling out the paperwork had observed. They forwarded that information and that paperwork to the prosecutor. And then over the course of the next about 12 to 16 hours, those officers, and while the plaintiffs were being detained, those officers continued to process the arrests, relying on the statements that they had personally observed, the plaintiffs. And it was only when the district attorney's office, interviewing the officers, relying on the statements in the booking sheets in the first place, realized that the officers had not, in fact, observed what they said they had, and they eventually released them after somewhere between 24 and 30 hours in custody. So even if there was probable cause- Any criminal complaints filed in the criminal court of New York City? No, Your Honor. There were no prosecutions. No criminal complaints, so no, there was an arrest, but there's no filing of an accusatory answer. Correct, Your Honor, in none of these cases. And under the criminal procedure law, that's how you commence a criminal proceeding, isn't it? That's how you commence a prosecution, that's right. No, there's no commencement of criminal proceedings. There was, that's right, which would be relevant in a malicious prosecution claim, Your Honor, but I don't- That would be very relevant with regard to your fair trial claim, wouldn't it? Well, that's certainly what Judge Castell held, but I think there's a problem with saying it's only if the prosecutor ends up prosecuting the case that it becomes an issue. It's not an arrest that there's an issue of probable cause or not. Presume you're wrong, there's probable cause for the arrest, because your complaint isn't with the officers who arrested. Your complaint is with the officers who processed. So your claim is that the officers put down information for which they did not have first-hand knowledge. Now, an accusatory instrument has to have non-hearsay allegations pursuant to 100.40 of the criminal procedure law. So either the officer saw himself, he or she saw himself, or from a supporting deposition from a witness who saw it. So there's a requirement of non-hearsay allegations as to the accusatory instrument. But where does the processing document have to be based on personal knowledge? Why couldn't it be based on hearsay? It could have been, but that's not what happened here. When it's based on hearsay, and there's testimony in the record about this from the chief of department at the time and from other supervisors at the time, if an officer informs me of something, I have to put in the paperwork. I'm informed by that officer that XYZ happened, not I observed it. If I put I observed it, I'm not telling the truth. You concede, though, that no criminal proceeding was commenced against any of these people. I do, Your Honor, but I don't think there needs to be the commencement of a- No, no, no. Understood. I do make that concession. I don't think. Yes. I want to make sure that you and I agree on this. That's right. I do agree with that, Your Honor. I see my time is up. I do have time reserved. Thank you. Thank you. Good morning. May it please the court. On behalf of the city of New York, my name is John Moore. The plaintiffs here were arrested after they clearly and admittedly violated the lawful order to disperse from Zuccotti Park. Their attempts to allege any constitutional violations- I know that they are admitting that they violated a lawful order. I apologize. That they, that's my editorializing, that they admittedly sat down, linked arms in the park after orders to disperse were given. I want to address that point to begin with, as that's where the plaintiffs began their argument. In the first place, a point that the plaintiffs pointedly omit from their briefing and from the arguments today is the clear evidence that Brookfield representatives did want the park cleared that evening. So setting aside the issues that you have raised today regarding whether the NYPD is able to act on their own in these situations, and we would argue that there is the possibility of doing that. There is evidence that Mike Larkin used a bullhorn to remind demonstrators of the park rules, ask they follow the rules. That Brookfield representatives, again through the MSA security, went through the park, asked trying to obtain compliance with those rules. That Mr. Larkin, again on behalf of Brookfield, used a bullhorn to announce the park needed to be cleared so that it could be cleaned to correct those rule violations. The ultimate question that plaintiffs seem to rely on, that there's a little bit of confusion as to which exactly NYPD officer was informed by Brookfield that they wanted the park cleared, is kind of beside the point where there's no question that Brookfield did want the park cleared, as evidenced by the announcements that they're making with the bullhorn to those who are gathered in the park. Moreover, even setting aside that issue, that Brookfield did in fact authorize it, whether the existence of Brookfield's authorization takes us outside the realm of probable cause, the answer is no, because reasonable officers seeing the situation, seeing Brookfield act, seeing the situation in the park, could have believed that an author- I can respond to the argument that once they were put on the bus and got separated from the arresting officers, and the officers who were with them had no personal knowledge about these individual arrestees, therefore they should have been released at that point. A couple points on that. The first is that there's no evidence that any individual officer was actually aware that there was no means to proceed with a prosecution in these cases. But surely they were aware when they swore that they had Correct, and I think on that point it's worthwhile separating, a plaintiff makes two arguments based on this separation. The first is that they were unlawfully detained beyond the point that they should have realized that they'd become separated. And second, that false information was filled out. Right, but I think it would be one thing if the officers had said, based on information I received from another officer, I have reason to believe that this person failed to follow an order, etc., etc. I don't think we would necessarily be here today if they had done that. The problem is by saying, damn, I personally observed the individual failing to heed the lawful order or what have you. It essentially suggested it was false, correct? And by appearing to comply with the requirements, it basically caused a delay in the release, or at least I understand this is their argument, it caused a delay in their release. So it ultimately, instead of being cleared up right like that, it took 30 hours before everyone figured out that there was a problem, and it's that 30 hours that they're basing their claim on. Right, so a couple points on that. The first is just as a matter of timeline, the point that they were arrested to the point that they were released is 30 hours. It's not 30 hours from the point that the arrest records were filled out to the point that they were released. So the timing isn't quite as described. What's the timing on that last part? I believe that the arrest records were filled out around 6 to 7 in the morning the following morning. There were people who were released the following morning at around 3 o'clock. The decision not to prosecute- Number of hours? 16 to 18 hours. If a jury could have found that they were held for longer, and that marginal difference is attributable caused by the false statements in the officer's affidavits, why is that not a valid claim? Because there's no evidence here that anyone was held in reliance on those rest records, as opposed to the fact that they were held in reliance on the fact that they'd been arrested in the park sitting down linking arms. Go ahead. I didn't mean to interrupt you. I wanted you to finish Judge Sherman's question. So just to use a potential analogy, had one of the plaintiffs, one of the arrestees, slipped through the cracks and an arrest record hadn't been filled out, there's no reason to think that that person would have been released any earlier than they were. So in that sense, the inclusion of that language, which was admittedly inaccurate in terms of what the officers observed, and not in terms of the conduct that the plaintiffs engaged in, did not increase the time that they were held. The documents upon which the prosecutor ultimately took a look at, and we may be assuming something that's not the case here, did the officers sign affidavits asserting why the individuals were arrested, or were they just processing? I mean, is there something in the record that shows us what these documents look like? What the arrest records look like? Your opponent says, look, they get separated from the people who arrested them. They then go ahead and officers, without first-hand knowledge, go ahead and process these people, and they assert themselves that they saw all of this occurring, that they're making representations that it occurred in front of them. I haven't heard you say that they didn't do that, but then, and we're using language like they swore to this, they submitted affidavits on this, and what I'd like to know is, because I haven't looked at that, I confess ignorance as to that, are those documents in the record, are they signing supporting depositions, or are they merely filling out data with regard, I've seen arrest dockets before, where people are arrested, and then there's a factual scenario beneath why they were arrested, and it just says, you know, laid down at Zuccotti Park, blah, blah, blah, blah, blah, blah. It may say on information belief, it may not say anything, it may not say on personal knowledge. Your opponent says they're all asserting that's on personal knowledge. Where do I look at to see what it is the officers said? So that would be on pages 475, 479, 483. Correct. 475. What volume would that be? I believe the third, fourth volume, the numbering 479, 483, 495, 499, and 503 for each of the plaintiffs. And what the records show in three of those instances on pages 475, 479, and 503, the narrative, which is not sworn to, it's not attested to, the narrative says that the officer observed the plaintiff, the arrestee in the park. And that's false. And that's false. Let me ask you, on the fair trial claim in Ricciuti and Garnett, this court held that a fair trial claim lies where an investigating officer fabricates information that is likely to influence a jury's verdict, forwards that information to prosecutors, and the plaintiff suffers a deprivation of life, liberty, or property as a result. I take it here you would concede that there is evidence that is certainly sufficient as to the first four requirements, investigating official fabrication of information likely to influence a jury and forwarding it to the prosecutors, correct? Yes, with the possible exception of influencing the jury. With the only distinction being that an officer's false testimony that they observed something is certainly likely to influence a jury. Or at least sufficient to get to a jury post to survive summary judgment. Potentially, but again, I would draw the line that where no charges are filed, to say that there's a fair trial claim where criminal procedures have a criminal process. Maybe it's a misnomer and it really shouldn't be called a fair trial claim. I guess my point is just to zero in on precisely where you think that claim fails. I take it it's on the last prong, the requirement that a deprivation of liberty is caused as a result. Your argument is that to the extent there was a deprivation of liberty here, it wasn't caused by the fabricated testimony. It was caused by the lawful arrest. Ultimately, they received a windfall, if you will, by the fact that there was fabricated testimony. That's exactly correct. And returning to Judge Wesley's question about the narratives, on for three of those narratives, for plaintiffs Castillo, Sharkey, and Smith, the description is written in a broader way than the other three. And it just says the arrestee was told to leave. It doesn't say that the officer witnessed that happen. It said that the arrestee was told to leave. The inaccuracies in those statements, and this is the exceptionally minimal point. There's no requirement in the arrest record. It's different from the accusatory instrument, which has to state the basis upon which the knowledge is obtained. I mean, that's pretty clear under 100.40. Absolutely. And the only inaccuracies in three of those? So if the arrest is good, I take it your position is if the arrest is good, the fact that the information of the processing was no good doesn't matter. Because ultimately, A, there was no criminal complaint filed. So in your view, that takes out the fair trial claim. Correct. B, if there had been no paperwork filed, they had 48 hours in which to detain them on an arrest that's good, and that's it. And the one other point . . . Absent . . . I'm showing a malice or ill will on the part of the officers that this was just a sham arrest, and it was just to hold somebody to jerk somebody around for a period. Right. And that's the point that I want to expand on just very briefly before I sit down, which is that the fact that the officers were honest with the district attorneys, that there was . . . I mean, they could have gotten away with this if there was actually ill will. They just didn't have to tell the district attorneys that they hadn't been the ones to see it. The fact that they were forthcoming with the district attorneys, which led to the charges not being filed, the declination to the prosecute, indicates that there was not ill will on the part of the officers. And a reasonable jury couldn't find that they had exercised ill will up to this point, but no further. And so in light of that, then the claims regarding the arrest records don't give rise to a constitutional claim. But is ill will a requirement of the fair trial claim? Well, not the fair trial claim. Again, on that point, I would rely on the fact that there wasn't a deprivation of liberty as to the excessive detention claim getting around the presumption. I want to just zero in on what the argument is. There is a deprivation of liberty. There's 12 to 16 hours that they were held after these arrest records were filled. Your argument is that it's not caused by the falsity in those records? That's correct, yes. OK. Thank you. Thank you. We'll hear the rebuttal. I think a reasonable jury could conclude that it was caused by the false statements. I mean, what was going on during the entire, beginning about an hour after they were arrested, was arrest processing and presentation of the case to prosecutors. What if they weren't processed at all? What if they were just sat there and they waited for the officers to come back who had firsthand knowledge and they sat there for 48 hours? There'd be no constitutional deprivation. There might have been a problem under New York law, but there wouldn't be a constitutional deprivation under the Fourth Amendment, would there? I agree, Your Honor, but that's not what happened. But you still have to show a causal connection between the wrong and between the activity and the harm that's in, and I guess my point is, is that, is it good? No. All right? Is it, but is it, is it indicative of malice? I'm not certain about that. But, but, but the simple fact of the matter is, is that it, because I, I have a hard time understanding how it extended it in terms of how you plot it, because the DA could have just sat and said, I'm not going to look at any of this until I have a chance to talk to the actual officers. But that's also not what happened, Your Honor. What happened as a practical matter, and what the record establishes, I think, unequivocally, is that the entire time that, that plaintiffs were detained, except for about the first hour, however long it took for them to get onto the bus and at, to the Midtown South Precinct, the officers were involved in creating the very paperwork that we're talking about. Do you think the paperwork is untruthful in the context of the acts asserted against your clients? I, some of them, yes, Your Honor. I mean, not all of them engaged in exactly the same conduct. But the main problem with the paperwork. Do you realize that some of the stuff was made up? Yes, that I observed X, Y, Z is made, was fabricated, was made up. Not as to the basis of the knowledge, but the acts attributable to your clients. Do you assert that those acts were made up? Like I said. Fabricated. Most of the plaintiffs engaged in at least some, and some of them engaged in most or all of the conduct that was alleged. No real dispute, is there, that they did these things. What was false was the I observed part. That's right. With the exception of maybe one or two plaintiffs and one or two things, they would be very upset at me if I lumped them all in the same group. I mean, I understood the claim to be principally false arrest. Is there a separate claim for, in essence, false imprisonment? That is, assuming the initial arrests are valid, is there a separate claim for the additional, you know, 12 hour delay because of the alleged delay, because of the processing? I'm not sure if it needs to be conceived as an additional or a separate claim. Whether you look at it under a fair trial rights analysis or whether you look at it under a fourth amendment analysis as an excessive detention. Is it pled? Is the claim, is it a separate? There's not a separate claim. There's not a separate claim that's specifically pled in those words. There's certainly a fourth amendment claim. There's certainly an excessive detention claim. There's certainly a false arrest claim. Within the context of the false arrest claim, I think it's well established that the police can't ignore exculpatory evidence. In this case, there was clearly exculpatory evidence in the form of they knew that they couldn't find the observing officers, so they couldn't prosecute them. That's not exculpatory evidence. That's not, you see, a police officer, I can see, you commit a crime in my presence. I hope not, Your Honor. I can arrest you. Wait, I can arrest you or I can arrest you even if you don't commit it in my presence and somebody else gives me reasonable cause to believe that you've committed a crime in my presence. I can then hand you off to somebody who takes you to the county jail and begins to process you to be held until you're arraigned in front of a local magistrate. Now, I may sign something or I may even call the fellow and say, put this down and that person then puts down what I saw or what I heard and that's the basis for holding you. And I don't think that that's either a false imprisonment or a violation of fair trial. But, and my problem that I'm having with this is that if indeed the people who had written the substantive, the narratives that ended up being the arrest records for these folks made things up about your clients, that's one thing. But if what they wrote was accurate as to what the arresting officer, the reason why the arresting officers arrested you, I have a hard time understanding how that, even though there's a misrepresentation as to the basis of their knowledge, I have a hard time understanding how that's a fair trial violation. Because the bit, I mean, I understand, Your Honor, but if, in the, if, Because the basis of their knowledge is irrelevant to the arrest record. Well, I don't think that's true, Your Honor. Because there's a requirement. It is once you start to write accusatory instrument, because the accusatory instrument has to be premised on first-hand knowledge. Or if it's based on hearsay, it has to have first-hand knowledge in the supporting deposition. But the arrest record, the arrest record, there's no public law requirement that it be based on first-hand knowledge, is there? Does the arresting officer have to fill out the arrest report? No, Your Honor, but, but, and this is what all of the officers who testified about this testified, and it's at, between pages eight, 17 and 20 of the, of the, my opening brief, I, I go into some detail about this. You cannot put in your, according to the NYPD chiefs, you can't put in your arrest processing paperwork, I observed that this person do X, if that's not true. It may not be a, it may not be a violation of department policy. The question is whether it's a constitutional tort or not. Well, in and of itself, I don't think it's a constitutional tort. But certainly, if it gives rise to a liberty deprivation, which I think a reasonable jury could find is what happened here, then it would rise to the level of a constitutional  Thank you, Your Honor. One other thing, if I may, one of the officers did fill out an accusatory instrument, that's at 516 to 517, and it was not against any of the plaintiffs in this case, but it was as part of the same arrest processing, and so. You don't mind that plaintiff? Too late, Your Honor. Okay. Thank you very much. Thank you. We'll reserve decision. Thank you. Nicely argued, both of you.